# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JASON HILL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:16-cv-00098-SGC |
| | ) | |
| THE UNIVERSITY OF ALABAMA | ) | |
| BOARD OF TRUSTEES, | ) | |
| | ) | |
| Defendant. | | |

# MEMORANDUM OPINION

The court has before it the February 17, 2017 motion for summary judgment filed by Defendant The University of Alabama Board of Trustees ("UA"). (Doc. 25). Pursuant to the court's initial order (Doc. 14) and March 9, 2017 extension (Doc. 32), the motion was under submission as of March 31, 2017. After consideration of the briefs and evidence, the motion is due to be granted for the following reasons.

## I.    STATEMENT OF FACTS

Plaintiff Jason Hill began his employment with Defendant on March 7, 2011. (Hill Dep. at 31). Hill worked at UA's Working On Womanhood Program ("WOW") which operates at the Girls Intensive Education and Treatment Facility. (Tippey Aff. ¶ 5). The facility houses female juvenile offenders ("the students")

with behavioral and mental health needs who have been adjudicated delinquent in the juvenile justice system and are committed to the custody of the Alabama Department of Youth Services. (*Id.* ¶ 7). The students often have a history of trauma, abuse, and neglect. (Hill Dep. at 36; Tippey Dep. at 19).

WOW operates a residential program providing students with gender-specific, outcome-driven interventions to help build coping skills and promote self-control of their emotions and behavior. (Tippey Aff. ¶ 8). WOW and its employees must follow certain guidelines and policies required by the Alabama Department of Youth Services and the American Corrections Association, including maintenance of a specific staff to student ratio, male to female ratio, and facility security. (*Id.* ¶ 9). WOW is also governed by the Prison Rape Elimination Act (PREA) which precludes males from entering the bedrooms of female students without accompaniment of a female staff member. (*Id.* ¶ 11).

During the relevant time, Hill worked as a direct care safety worker. (Hill Dep. at 32-33). Hill's duties were to operate the facility and to supervise and care for its female students. (*Id.* at 33). Hill began by working the first shift from 6:45 a.m. until 3:00 p.m. but in the summer of 2013, he worked the third shift, from 10:45 p.m. until 7:00 a.m. (Tippey Aff. ¶¶ 15, 17). Shifts are scheduled with a fifteen minute overlap to provide incoming employees time to communicate with outgoing employees on matters arising during the previous shift. (*Id.* ¶¶18-19).

WOW also maintains a log book where employees record a general summary of the shift and highlight any significant incidents or issues. (*Id.* ¶¶ 20-21).

Hill directly reported to the direct care supervisor for his shift. (Hill Dep. at 16). The direct care supervisors reported to the care manager, who during all relevant times was Shaun Patterson. (*Id.*; Patterson Dep. at 10). The care manager reports to the program director, who was Dr. Jacalyn Tippey[1] during all relevant times. (Tippey Aff. ¶ 16; Tippey Dep. at 11). The program director is the highest ranking employee at the facility. (Tippey Dep. at 10, 14). The program director reports to the executive director of the Youth Services Institute, a position held by Jill Beck since February 2014. (Tippey Aff. ¶ 16; Beck Dep. at 7, 19-20).

WOW utilizes progressive discipline. In the absence of an act warranting immediate termination, discipline generally begins at a lower level and increases with each additional disciplinary counseling. (Tippey Dep. at 31-34). Although counselings never roll off an employee's record, after a certain time has passed, disciplinary issues are generally discounted as they age. (*Id.*; Beck Dep. at 118).

During Hill's employment, he received eleven formal and/or information disciplinary counselings, detailed as follows:

| 1/31/12 | Time and attendance. |
|---------|----------------------|

[1] Dr. Tippey has a Ph.D in Counselor Education and is a licensed professional counselor with a variety of national certifications. (Tippey Aff. at ¶ 3).

| | |
|---|---|
| 10/25/12 | Time and attendance. Hill called in or was tardy 49 times in a three month period. |
| 3/9/13 | Failure to follow a supervisor's instructions and disrespectful communications. |
| 3/21/13 | Report made by an outside dental office employee of unprofessional communications in front of a student; disrespectful communications to a supervisor; specifically, calling Patterson a "shithead." |
| 4/11/13 | Safety violation – knife was used in a student demonstration. |
| 5/6/13 | Inattentive to duty and interfering with the work assignments of others. |
| 6/6/13 | Walking off the job without approval or notice. |
| 10/2/13 | Time and Attendance. |
| 7/18/14 | Time and Attendance. |
| 11/25/14 | Time and Attendance. |
| 11/25/14 | Failure to secure facility doors and being inattentive to duty; three other females were also disciplined.[2] |
| 1/16/15 | Hill termination. |

(Beck Aff. ¶ 6; Exhs. A-K to Beck Aff.). Other than his termination, none of Hill's disciplinary counselings resulted in a loss of pay, demotion, suspension, or change of job duties. (Beck Aff. ¶ 6). Although Hill spends much time in his brief outlining the events surrounding the April 11, 2013 counseling for a safety violation and the November 25, 2014 counseling for failure to secure the doors and being inattentive, none of that information is relevant to the claims before the court. (*See infra* at III.A.1.). The court limits its recitation of the facts to the events surrounding Hill's termination. (*Id.*).

---

[2] Hill's November 25, 2014 counseling was marked as a "Final Counseling" and noted "dismissal will be recommended" in the absence of improvement. (Hill Dep. at 116-17; Exh. K to Beck Aff.). Three other female employees were also given counselings for failure to secure facility doors and/or being inattentive to duty; one of those was a final written warning. (Hill Dep. at 116-17; Beck Aff. ¶ 9; Exhs. P, Q, R).

## A. January 6, 2015 Incident

On January 6, 2015, a student, T.B., did not attend school because she displayed behavior characterized in various notes as aggressive, threatening, and volatile. (Hill Dep. at 53; Tippey Dep. at 71; Anders Dep. at 41-51). At some point during the day, Dr. Tippey made an agreement with T.B. that if her behavior improved, she could sleep in her own room that night, rather than a safe room.[3] (Tippey Dep. at 84). Before Dr. Tippey left the facility for the night, T.B.'s behavior improved and stabilized. (*Id.* at 84-85).

Dr. Tippey spoke with Octavia Anders, a member of the second shift, and informed her T.B. had been upset earlier that day but "turned her behavior around, was stable, and therefore was allowed to sleep in her room that night" with Anders on sentry duty[4] during the second shift.[5] (Tippey Dep. at 84-85). Additionally, Dr. Tippey left an entry in the log book requiring T.B. to be monitored by sentry duty because of her earlier behavior. (Hill Dep. at 54-55; Tippey Dep. at 86).

---

[3] A safe room is a padded room with a mattress on the floor, a toilet, a sink, and a safety blanket that cannot be ripped or tied around the body to prevent self-harm. (Hill Dep. at 45, 98-100). The room is monitored by video camera. (*Id.* at 45-46).

[4] Sentry duty requires an employee to stay at or in very close proximity to a student's bedroom door and perform regular and consistent visual checks though the bedroom window to monitor the student's safety, as well as to listen through the door for disturbances. (Hill Dep. at 55; Anders Dep. at 37, 47-49; Tippey Dep. at 88-89).

[5] Plaintiff makes much of Dr. Tippey's testimony that she designated Anders shift supervisor on second shift because there was not a supervisor present that day. Whether or not Anders was shift supervisor is immaterial to the ultimate issue before the court – whether plaintiff was discriminated against because of his sex.

T.B went to her bedroom in the C-pod[6] for the night at around 8:30 p.m. (Anders Dep. at 47). As instructed, Anders performed sentry duty outside T.B.'s door from the majority of the time between 8:30 p.m. and 11:00 p.m., when the second shift ended. (*Id.*). Hill arrived at the facility that night at 10:43 p.m. for third shift. (Hill Dep. at 52). Other members of the third shift included two females, Giselle Royal and Jackie May, and two males, Michael Jelks and Jace Peaden. (Hill Dep. at 50-51). Hill reviewed the log book when he arrived and read Dr. Tippey's entry relating to T.B. (*Id.* at 52-55).

As the second and third shifts conferred during the shift change, according to Hill, Anders told the third shift employees T.B. had expressed she wanted to kill herself, she wanted to die, and she was going to harm herself. (*Id.* at 60-62). Another second shift employee told Hill the control room attempted to call Dr. Tippey but was unsuccessful. (*Id.* at 62-64). Additionally, it was noted there were only two female employees on third shift, they would be needed in other areas during the shift, and it would not be appropriate for a male employee to be alone on sentry duty. (Peaden Decl. ¶ 9). There was also some concern about the lack of visibility into T.B.'s bedroom at night. (Exh. D to Tippey Aff.). As such,

---

[6] The C-pod consists of eight individual bedrooms, a safe room, and a sitting area. (Tippey Aff. ¶ 40).

according to Hill, the group[7] decided the safest course of action was to move T.B. from her room to the safe room where she could be monitored on camera to prevent any incident during the shift. (Hill Dep. at 68, 70-72, 105-06, 286-88; Jelks Dep. at 41-42).

Anders was on sentry duty by T.B.'s door when Hill, Peaden, and Jelks entered the C-pod at 10:47 p.m., four minutes after Hill arrived at the facility. (Hill Dep. at 109; Tippey Dep. at 122-24; Pl. Exh. 23). Jelks carried regular linens for T.B. to make her as comfortable as possible and walked toward the safe room. (Jelks Dep. at 49-50; Pl. Exh. 23). Peaden walked to the safe room and removed the safety blanket. (Jelks Dep. at 70; Pl. Exh. 23). Anders asked whether the men had received permission from Dr. Tippey to move T.B., and Jelks replied "no." (Jelks Dep. at 48, 49, 78; Hill Dep. at 109-10; Pl. Exh. 23). Geraldine Smith, a second shift employee, also asked whether anyone had permission to move T.B. (Hill Dep. at 113-14; Pl. Exh. 23).

Peaden and Hill approached T.B.'s door, and Anders called out "Suite 9" to tell the control room to open the door to T.B.'s room. (Jelks Dep. at 71-72; Peaden Decl. ¶ 7; Pl. Exh. 23). Hill then waved his hand above his head to signal to the

---

[7] Hill testified "the group" included individuals on the second and third shifts, specifically Jace Peaden, Michael Jelks, and Hill, and they discussed it with Octavia Anders and Giselle Royal. (Hill Dep. at 68). According to Hill, everyone agreed with the decision according to Hill. (*Id.* at 68-69). The court notes there is evidence contradicting that Anders and Royal were involved in the decision in any way. At the summary judgment stage, however, the court views the evidence in the light most favorable to Plaintiff.

control room to open the door. (Pl. Exh. 23; Jelks Dep. at 72-73). Anders again called out "Suite 9" and "lights on" as the door to T.B.'s room was opened. (Jelks Dep. at 73-74; Peaden Decl. ¶¶ 7, 10; Pl. Exh. 23). Peaden and Hill entered T.B.'s room, and the men escorted her from her room to the safe room. (Hill Dep. at 110). No females entered T.B.'s room, although there were three females in the common area of the C-pod when T.B. was moved. (Jelks Dep. at 71-80; Pl. Exh. 23). Jackie May documented the move in the log book as follows: "Upon arrival all girls were asleep in assign [sic] room. T.B. was place[d] in SR2 for observation due to sentry duty. No problems noted at this time." (Pl. Exh. 22).

After Anders' shift ended and she left the facility, at 12:07 a.m., she sent an email to Dr. Tippey notifying her T.B. was moved from her room to the safe room. (Tippey Dep. at 106-08; Pl. Exh. 24). The relevant portion of the email states:

> Tonight (Jan. 6th) when 3rd shift came on it was told to them that T.B. was on sentry duty and she was sleeping in rm 9. Shortly after they came over with linen and stated that they were putting her in SR2. I informed them that per you (Dr. Tippey) she was to sleep in rm 9. They stated that they were moving her to SR2. They politely woke her up and put her in SR2. I informed them that the toilet is leaking in SR2, not to turn the water on and if she needs to go she needs to come out. I exited the pod.

(*Id*.)

## B. The Investigation and Plaintiff's Termination

Upon arrival at the facility on January 7, 2015, Dr. Tippey met with T.B. (Tippey Aff. ¶ 65; Tippey Dep. at 109, 113). According to Dr. Tippey, T.B. was

confused and distressed. (Tippey Dep. at 113). T.B. specifically questioned why she was moved from her room when she complied with her part of the deal and improved her behavior. (*Id.* at 109, 113). Dr. Tippey apologized for the miscommunication. (*Id.* at 113).

Dr. Tippey then initiated an investigation into the incident. (Tippey Aff. ¶ 39). First, she reviewed the video surveillance[8] from the C-pod. (*Id.* ¶40). She next requested written incident reports from Hill, Jelks, Peaden, Smith, and Jykia Johnson, the individuals shown on the video. (*Id.* ¶ 48; Exhs. C-G to Tippey Aff.). She did not request anything from Anders because she had her email detailing her recollection of the events. (*Id.* ¶ 49). The written accounts were consistent and indicated to Dr. Tippey the following: (1) T.B. was sleeping; (2) Hill, Jelks, and Peaden decided to move her; (3) Anders and Geraldine Smith questioned whether Dr. Tippey gave authority for the move; and (4) Hill and Peaden entered T.B.'s room, awakened her, and moved her to the safe room. (*Id.* ¶ 50; Exhs. C-G to

---

[8] Dr. Tippey reviewed the full, unedited video from that night. (Tippey Aff. ¶ 40 n.1). In discovery, Defendant produced portions of the video surveillance from January 6, 2015. (Pl. Exh. 23). Additionally, certain areas of the video produced were blurred or pixelated. (*Id.*). The pixelated corner is where T.B. exited her room and walked to the safe room. (*Id.*; Tippey Dep. at 121-29). It also obscures Anders who was seated outside T.B.'s door. (*Id.*).

Throughout his brief, Hill insinuates wrongdoing on the part of Dr. Tippey in the partial preservation and blurring of the video. Plaintiff does not, however, produce any evidence to suggest intentional tampering with evidence as it relates to Hill's lawsuit. Instead, Dr. Tippey testified video footage is written over when the system runs out of storage, or approximately every 30 days. (Tippey Dep. at 134-35; Doc. 39 at n.17). Dr. Tippey saved the portion she believed was the most relevant to her investigation with the best combination of audio and video. (Tippey Dep. at 135-37). She saved the video in January 2015, approximately 6 months before Hill filed his EEOC claim. The portion of the video was blurred in compliance with Alabama law. *See* Ala. Code § 12-15-133(g).

9

Tippey Aff.). No one contended T.B. was moved because she exhibited behavioral concerns. (Tippey Aff. ¶ 55).

Dr. Tippey, along with care manager Shaun Patterson and direct care supervisor for the night shift, Mandi Ethridge,[9] conducted interviews with Hill, Jelks, Peaden, Anders, and Smith to further understand what occurred. (Tippey Aff. ¶ 51; Exh. H to Tippey Aff.). The interviews confirmed the facts as seen in the surveillance video and contained in the written incident reports, including that Jelks, Peaden, and Hill decided to move T.B. (Tippey Aff. ¶ 52). No one reported that the move was discussed with Anders or that Anders (or any other female employee) agreed that T.B. should be moved. (*Id.* ¶ 57).

Dr. Tippey was concerned about the results of her investigation for three main reasons. First, the trust she sought to build with T.B., which directly affects her ability to provide effective treatment, was violated. (*Id.* ¶¶ 38, 58; Tippey Dep. at 109, 110-13). Second, two males should not have entered a female student's room but should have requested a female enter with them to avoid a PREA issue. (Tippey Aff. ¶ 59). Finally, T.B. was asleep when the men entered. (*Id.* at 60). T.B. had been sexually assaulted by men in the past, and to be awakened by two men in her room created a "risk of frightening her, re-victimizing her, and could have caused her to have a behavioral or violent outburst." (*Id.*)

---

[9] Ethridge was not at the facility the night of the incident. (Tippey Dep. at 71).

Dr. Tippey met with Executive Director of the Youth Services Institute Jill Beck and Patterson to discuss the incident and the results of her investigation. (Tippey Aff. ¶ 61). Based on the video, written reports, and interviews, Beck and Dr. Tippey concluded Jelks, Peaden, and Hill were insubordinate to Dr. Tippey's orders, showed poor judgment in not consulting with the employee on sentry duty as to T.B.'s current mental state and Dr. Tippey's instructions, and, as males in a non-emergency situation, chose to enter the room of a sleeping female student. (Tippey Dep. at 163, 214, 216-17; Dep. of Beck at 125-26; Beck Aff. ¶20). Dr. Tippey and Beck determined the three men who actively played a role in the relocation of T.B. from her room to the safe room should be disciplined for the incident. (Beck Aff. ¶ 21; Tippey Aff. ¶ 61). Beck did not believe the conduct of any other employee that night warranted discipline because there was no evidence anyone else chose to move T.B., entered T.B.'s room, or moved T.B. (Beck Aff. ¶ 22).

Jelks and Peaden both received written counselings. (Exhs. J, K to Tippey Aff.). They were not terminated because they had not received a final warning before this incident. (Tippey Aff. ¶ 63). Hill, on the other hand, had received a final written warning notifying him he would be terminated for any additional disciplinary infraction. (Hill Dep. at 116-17; Exh. K to Beck Aff.). Dr. Tippey and Beck, therefore, decided to terminate Hill. (Tippey Aff. ¶ 62; Beck Aff. ¶ 24).

Ethridge and Beck met with Hill on January 16, 2015, and notified him of his termination.  (Beck Aff. ¶ 24).

### C. Hill's EEOC Charge and Notice of Right to Sue

Hill filed an EEOC charge on June 15, 2015, alleging discrimination on the basis of his sex and retaliation.  (Doc. 30-1).   In his charge, Hill contends he was discriminated against in his January 16, 2015 termination and in a November 25, 2014 disciplinary counseling.  (*Id*.).  Hill's retaliation charge alleges he met with Patterson in November 2014 to discuss the matters leading to his November 25, 2014 counseling and asserts he complained to Patterson during that meeting about being disciplined because of his sex.  (*Id*.).  After an investigation, the EEOC dismissed Hill's charge on October 22, 2015, and he timely filed his complaint on January 20, 2016.  (Doc. 1; Doc. 30-2).

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it

believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id*. at 249.

## III.  DISCUSSION

Plaintiff's Second Amended Complaint states two claims: (1) sex discrimination in violation of Title VII; and (2) retaliation in violation of Title VII. (Doc. 30 at 11-13). After careful review and for the reasons stated below, the court concludes there are no material issues of fact in this case and Defendant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56.

### A. Title VII Discrimination

A Title VII disparate treatment claim based on circumstantial evidence, as the one presented here, is analyzed under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). To establish a prima facie case of disparate treatment, the plaintiff must show: (1) he is a member of a protected class; (2) he was subjected to adverse employment action; (3) his employer treated similarly situated employees outside his class more favorably; and (4) he was qualified to do the job. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). After a prima facie case is established, the employer has the burden to articulate a legitimate, nondiscriminatory reason for the employment decision. *Wilson*, 376 F.3d at 1087. This burden involves no credibility determination, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509, (1993), and has been characterized as "exceedingly light." *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1141 (11th Cir. 1983). As long as the employer articulates "a clear and reasonably specific" non-discriminatory basis for its actions, it has discharged its burden of production. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981). After an employer articulates one or more legitimate, non-discriminatory reasons for the employment action, the plaintiff must show the proffered reason was a pretext for illegal discrimination. *Id.* If the proffered reason is one that might motivate a

reasonable employer, a plaintiff cannot recast the reason but must "meet that reason head on and rebut it." *Chapman v. AI Transp.,* 229 F.3d 1012, 1030 (11th Cir. 2000).

Additionally, the court is mindful that in *Sims v. MVM, Inc.,* 704 F.3d 1327, 1332–1333 (11th Cir. 2013), the Eleventh Circuit clarified that the *McDonnell Douglas* framework is not the only way for a plaintiff to survive summary judgment in a discrimination case. *See Smith v. Lockheed–Martin Corp*., 644 F.3d 1321, 1328 (11th Cir. 2011). Rather, "[t]he plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.* A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a "convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision maker. *Id.; see generally Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012).

### 1. Plaintiff's termination is the only actionable adverse employment action before the court.

The Second Amended Complaint alleges multiple adverse employment actions in support of Hill's claim of discrimination. First, Hill alleges WOW selectively enforced its time and attendance policy as well as other unnamed disciplinary policies. (Doc. 30 ¶12). Next, Hill references the disciplinary counseling he received for his role in the April 13, 2013 incident where someone

brought a knife into the facility. (*Id*.) Third, Hill contends the November 25, 2014 disciplinary counseling he received for allegedly leaving an outside door open was discrimination because of his sex. (*Id*. ¶¶ 14-17). Finally, Hill alleges his termination on January 16, 2015, was discrimination on the basis of sex. (*Id*. ¶¶ 18-25).

Nonetheless, Plaintiff's termination is the only actionable adverse employment action properly before the court. Although addressed by Defendant in its brief in support of its motion for summary judgment (Doc. 26), Hill's response does not discuss his claim of sex discrimination in connection with the enforcement of the time and attendance policy, the enforcement of any other disciplinary policies, or his November 25, 2014 disciplinary counseling. (*See* Doc. 35). Additionally, Hill admits the disciplinary counseling for his role in the April 13, 2013 incident is not a discrete claim before the court. (Doc. 35 at 35). The court, therefore, determines to the extent they were pled in his Second Amended Complaint, Hill abandoned these claims at summary judgment.[10] *See Powell v. Am. Remediation & Envtl., Inc*., 61 F. Supp. 3d 1244, 1252, n.9 (S.D. Ala. 2014) ("[w]here a non-moving party fails to address a particular claim asserted in the summary judgment motion but has responded to other claims made by the movant,

---

[10] Even if Plaintiff did not abandon those claims, each incident occurred more than 180 days before Hill filed his Charge of Discrimination with the EEOC, and therefore, they are time-barred.

the district court may properly consider the non-movant's default as intentional and therefore consider the claim abandoned."); *see also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

### 2. Plaintiff cannot establish a prima facie case of discrimination.

Plaintiff's prima facie case fails because he cannot identify a similarly situated comparator who was treated more favorably than he was treated. The employees identified by a Title VII plaintiff as comparators must be similarly situated in all relevant respects. *Wilson*, 376 F.3d at 1091; *Holifield*, 115 F.3d at 1562. The Eleventh Circuit has held this to mean that "[t]he comparator must be nearly identical to the plaintiff." *Wilson*, 376 F.3d at 1091; *Mannicia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Maniccia*, 171 F.3d at 1368 (quotations omitted). Thus, the Eleventh Circuit requires "the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Id*. Even if a plaintiff and comparator are similar in some respects, differences in their overall record may render them not "similarly situated" for purposes of establishing a prima facie case. *See, e.g., Knight v. Baptist Hosp. of Miami, Inc.*,

330 F.3d 1313, 1316–19 (11th Cir. 2003) (the employee and comparator who committed the same act were not similarly situated because the comparator's overall record was better).

Plaintiff does not address the specific elements of his prima facie case in the argument section of his brief but instead points the court to his statement of facts. (Doc. 35 at 27).  In his statement of facts, Plaintiff argues the actions of Octavia Anders and Giselle Royal are comparable to his actions the night of January 6, 2015.  (*Id.* at 12-19, 22-26).  The undisputed evidence, however, reveals that neither Anders nor Royal is an appropriate comparator.  The court first addresses Royal and then moves to Anders.

It is undisputed that Royal was in the control room at the time T.B. was moved from her room to the safe room.  Vincent Newell was also in the control room during this time.  (Jelks Dep. at 35-38).  Although Hill testified that Royal opened the door to T.B.'s room from the control room, it is impossible for the court to know who actually opened the door.[11]  Regardless, even if Royal did open the door, she did so in response to what she saw and heard taking place in the C-pod – Anders saying "Suite 9," Hill and Peaden standing at the door, and Hill waving his hands signaling to the control room to open T.B's door.  The action of

---

[11]  Neither Royal nor Newell were questioned or disciplined regarding the incident, and there is no other evidence before the court as to who opened the door other than Hill's self-serving testimony. (*See* Tippey Aff.).

opening the door from the control room after being told to do so by multiple people on the C-pod is not "nearly identical" to entering a sleeping student's room, waking her up, and moving her to a safe room. *Maniccia*, 171 F.3d at 1368; *see*, e.g., *Floyd v. Fed. Exp. Corp.*, 423 F. App'x. 924, 930 (11th Cir. 2011) (two employees involved in an altercation with each other were not similarly situated when one attempted a punch and the other put his finger in the other's face); *Curtis v. Broward Co.*, 292 F. App'x. 882, 884 (11th Cir. 2008) (employee who hung up on a customer once or twice was not similarly situated to an employee who hung up on a customer four times). Royal, therefore, is not a similarly situated comparator as a matter of law.

Although Anders was present on the C-pod when T.B. was moved from her room to the safe room, she, too, is not similarly situated. Hill argues that Anders took part in the decision to move T.B.,[12] twice called out "Suite 9" to tell the control room to open T.B.'s door, and said "lights on" when the door was opened. (Doc. 35 at 16-18). Hill fails to mention, however, that as soon as the men entered the C-pod and before Anders made any of these statements regarding T.B.'s room, Anders asked whether Hill, Jelks, and Peaden had permission from Dr. Tippey to

---

[12] Hill's testimony is the only evidence before the court that Anders participated in a conversation to move T.B. In fact, Jelks testified that Hill, Jelks, and Peaden were the ones who made the decision. Additionally, it is undisputed that Anders asked the three men whether they had permission from Dr. Tippey to move T.B. when the men entered the C-pod. For purposes of summary judgment, however, the court considers the facts in the light most favorable to Plaintiff.

move T.B.  He also omits Anders' email to Dr. Tippey shortly after she left her shift that night notifying her of the move.

Anders conduct is not nearly identical to Hill's conduct.  Hill entered the room of a female student, woke her from sleep, and moved her to a safe room. These actions were in direct conflict with written orders in the log book by Dr. Tippey and in violation of policies and procedures prohibiting males from entering a female student's room without accompaniment of a female.  Anders did not physically move T.B. and in fact questioned the decision to move her.  Hill's argument suggests Anders' acquiescence equates with agreement and participation, but under the case law, Anders' actions, or lack thereof, are simply not "nearly identical" as to qualify Anders as a similarly situated comparator.  *See Maniccia*, 171 F.3d at 1368; *Reynolds v. Winn-Dixie Raleigh, Inc*., 85 F. Supp. 3d 1365, 1372 (M.D. Ga. 2015) (two pharmacists who misfiled a prescription were not similarly situated when one entered the prescription in the computer, submitted a claim for payment to Medicaid, and created a label for the medicine, while the other pharmacist filled the container and dispensed the medicine).

Because Plaintiff cannot identify a similarly situated comparator who was treated more favorably than he was treated, his prima facie case fails.  As such, Defendant is entitled to summary judgment as to Hill's claim of discrimination.

### 3. Defendant's legitimate, nondiscriminatory reasons.

Even if Plaintiff could establish a prima facie case, Defendant has carried its "exceedingly light" burden of articulating legitimate, nondiscriminatory reasons for Plaintiff's termination. As discussed in detail above, Hill was terminated because, after an investigation, Dr. Tippey and Beck concluded Hill, Jelks, and Peaden moved T.B. without permission, entered her room without a female staff member, woke her from sleep, and moved her to the safe room. Hill had already received a final warning notifying him he would be terminated for any additional disciplinary infraction. (Hill Dep. at 116-17; Exh. K to Beck Aff.). The incident relating to T.B. was the next, and final, infraction for Hill and resulted in his termination.

### 4. Plaintiff failed to rebut defendant's legitimate, nondiscriminatory reason for his termination

Because Defendant satisfied its burden of production of a legitimate, non-discriminatory reason for Plaintiff's termination, Plaintiff must come forward with evidence sufficient to permit a reasonable fact finder to conclude the reasons Defendant gave were pretextual. *Burdine*, 450 U.S. at 253. Plaintiff may do so by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [Defendant's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Springer v. Convergys Customer Mgmt. Group, Inc.*, 509 F.3d 1344, 1348-50 (11th Cir. 2007).

Importantly, conclusory allegations of discrimination, without more, are insufficient to show pretext. *Mayfield v. Patterson Pump Co*., 101 F.3d 1371, 1376 (11th Cir. 1996). "A reason is not pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006).

To show pretext, a plaintiff may not merely quarrel with the wisdom of the employer's reason but must meet the reason head on and rebut it. *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010); *Chapman*, 229 F.3d at 1034. The inquiry into pretext is based on "the employer's beliefs, and not the employee's own perceptions of his performance." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997). As the Eleventh Circuit explained, "to be blunt about it," the inquiry does not center "on reality as it exists outside of the decision maker's head." *Alvarez*, 610 F.3d at 1266 (explaining the question is not whether the employee actually had performance problems but "whether her employers were dissatisfied with her for these or other non-discriminatory reasons, even if mistakenly or unfairly so, or instead merely used those complaints . . . as cover for" discrimination).

Plaintiff makes four arguments in his attempt to establish pretext. First, he contends Defendant provided inconsistent explanations for his termination. (Doc.

35 at 29-30). Hill next asserts the investigation into the incident was "incoherent, contradictory, and evidences bias against male employees." (*Id*. at 30-34). Third, Hill contends Defendant disciplined male and female employees inequitably. (*Id*. at 34-36). Finally, Hill argues his changed FMLA status suggests the decision to terminate him was discriminatory. (*Id*. at 36-37). The court addresses each argument in turn.

Although an employer's shifting and inconsistent explanations may be evidence of pretext, *Cleveland v. Home Shopping Network, Inc*., 369 F.3d 1189, 1194-95 (11th Cir. 2004), the record does not support Hill's contention that Defendant gave inconsistent reasons for his termination. Hill argues Beck told him in his termination meeting he was being fired because he was insubordinate to Anders, his shift supervisor (Hill Dep. at 293-94), but in Defendant's EEOC position statement, Defendant changed its position and stated he was terminated because he failed to follow Dr. Tippey's instructions. (Pl. Exh. 37). These reasons, however, are not fundamentally inconsistent as to support a finding of pretext. *See Zaben v. Air Prods. & Chems., Inc.*, 129 F.3d 1453, 1558-59 (11th Cir. 1997). Defendant has consistently maintained Hill was terminated, after receiving a final counseling, for his role in moving T.B. Not only was moving T.B. in direct contradiction to Dr. Tippey's log book instructions, T.B. was sleeping and Hill and Peaden entered her room without a female staff member,

thus creating a potential violation of PREA. In short, every explanation regarding Hill's termination centers on his actions the night of January 6, 2015. Defendant has not given two completely different explanations for Hill's termination, as required to establish pretext. *Compare Bechtel Constr. Co. v. Sec'y of Labor*, 50 F.3d 926, 935 (11th Cir. 1997) (finding evidence of pretext due to shifting explanations where employer explicitly denied in district court employee's job performance was basis for termination but on appeal argued employee's layoff was solely due to poor performance).

Next, Hill's criticism of Defendant's investigative process does not establish pretext. Hill's argument can be broken down to the following allegations: (1) Dr. Tippey's investigation focused solely on male employees and did not address the role of Anders and/or Royal; (2) alleged statements made by employees and relied on by Dr. Tippey and Beck are not on the video produced; and (3) Anders should have been disciplined for her role in the incident. (Doc. 35 at 31-34). Hill's beliefs about the adequacy of the investigation, the conclusions of Dr. Tippey and Beck, and/or which employee should have been disciplined are irrelevant to the issue of pretext. Title VII allows employers to conduct their investigations in any way they see fit, as long as those investigations are not motivated by unlawful animus. The court is not concerned with whether the decision was "prudent or fair." *Rojas*, 285 F.3d at 1342. The Eleventh Circuit has repeatedly stated that the

court does not sit "as a 'super-personnel department,' and it is not [the court's] role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." *Alvarez*, 610 F.3d at 1266 (quoting *Chapman*, 229 F.3d at 1030).

Third, Hill contends Defendant disciplined male and female employees differently. (Doc. 35 at 34-36). As evidence of this alleged inequitable treatment, Hill points to an incident in 2013 where a female employee used a knife in a cooking demonstration. This incident, however, resulted in the discipline of Hill and four female employees. (Beck Aff ¶ 8, Exhs. L-O). Hill's disciplinary counseling was identical to three of the four female employees who were involved in the incident but did not bring the knife into the facility.[13] (*Id.*). The evidence simply does not support Hill's argument and is not sufficient to permit a reasonable fact finder to conclude the reasons Defendant gave for his termination were pretextual. *Burdine*, 450 U.S. at 253.

Finally, Hill argues his changed FMLA status suggests the decision to terminate him was a pretext for sex discrimination. (Doc. 35 at 36-37). Hill compares his approval for FMLA leave with that of Mandi Ethridge's and

---

[13] The other female employee was disciplined differently because she brought the knife into the facility. (Exh. L to Beck Aff).

contends their differences are circumstantial evidence of sex discrimination.[14]  This

argument does nothing to establish pretext in regard to Hill's termination.  Hill and

Ethridge were approved for FMLA leave by Human Resources at the University of

Alabama when each submitted the appropriate eligibility documentation.  (Hale

Aff. ¶¶ 9-11).  The timing of the approval was based on the timing of the requests.

(*Id.*).  No one at WOW played any role in these determinations.  (*Id.* ¶ 12).

Although not specifically enumerated by Hill as a pretext argument, he

contends throughout his brief that he followed all policies and procedures the night

of January 6, 2015.  (Doc. 35 at 12-15, 19-22).  For purposes of Rule 56, however,

the court is not concerned with whether Hill actually committed the offense but

whether Defendant honestly believed Hill engaged in the misconduct.  "An

employer who fires an employee under a mistaken but honest impression that an

employee violated a work rule is not liable for discriminatory conduct." *Damon v.

Fleming Supermarkets of Fla., Inc*., 196 F.3d 1354, 1363 (11th Cir. 1999).  The

"sole concern is whether unlawful discriminatory animus motivated" the

termination. *Alvarez*, 610 F.3d at 1266.

Plaintiff has presented no evidence to even suggest Dr. Tippey and Beck did

not believe that Hill, Jelks, and Peaden made the decision to awaken T.B. and

---

[14]  Hill also notes there was not an FMLA application in Ethridge's personnel file.  (Doc. 35 at
37).  The FMLA requires the University maintain FMLA documents, including medical
certifications, in files separate from an employee's personnel file.  29 C.F.R. § 825.500(g).

relocate her to the safe room despite the instructions of Dr. Tippey. He can dispute whether their conclusion was correct, but such an argument is not sufficient under the law. *See Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). The pretext inquiry "centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez*, 610 F.3d at 1266 (citing *Holifield*, 115 F.3d 1555, 1565 (11th Cir. 1997)).

For the reasons stated, Plaintiff has failed to establish the reasons stated for his termination were a pretext for sex discrimination. Defendant is entitled to summary judgment on Plaintiff's disparate treatment claim.

### B. Title VII Retaliation

As in the discrimination context, where proof of retaliatory intent is offered by way of circumstantial evidence, as here, courts apply a burden-shifting scheme analogous to the *McDonnell Douglas* framework outlined above. *Holifield*, 115 F.3d at 1566; *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1162-3 (11th Cir. 1994). If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Id.* Once the employer proffers a legitimate reason for the adverse employment action, the burden shifts back to the plaintiff to show the legitimate reason was pretext for prohibited retaliatory conduct. *Id.*

**1. Plaintiff failed to establish a prima facie case of retaliation.**

To establish a Title VII retaliation claim based on circumstantial evidence, Plaintiff must show: (1) he engaged in statutorily protected expression; (2) he suffered a materially adverse employment action; and (3) there is a causal connection between the two events. *See Crawford*, 529 F.3d at 970; *see also Dixon v. The Hallmark Cos., Inc.*, 627 F.3d 849, 854 (11th Cir. 2010); *Goldsmith v. Bagby Elevator Co., Inc.,* 513 F.3d 1261, 1277 (11th Cir. 2008). The definition of adverse employment action in the context of a retaliation claim is broader than that applicable to a discrimination claim. A materially adverse action "means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Crawford*, 529 F.3d at 974. Additionally, the employee must show that "a reasonable employee would have found the challenged action materially adverse." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68.

As to his protected conduct, Plaintiff testified he made numerous complaints of discrimination during his employment. His argument, however, does not attempt to tie those general complaints to any particular employment action. Rather, his brief focuses on a November 2014 meeting with Beck.[15] (Doc. 35 at 8-10; 38-39). Plaintiff testified he complained to Beck that Dr. Tippey was applying

---

[15] Plaintiff's EEOC Charge, however, alleges his complaint was to Patterson in November 2014. (Doc. 30-1).

the time and attendance policy in a discriminatory manner against male employees. (Hill Dep. at 210-11). Specifically, Hill told Beck his medical issues, which were allegedly the reason he was tardy to work, were being ignored, whereas Dr. Tippey and Patterson allowed tardiness and absences by similarly situated female employees. (*Id*. at 176-81). This testimony establishes the first element of Plaintiff's prima facie case, and it is undisputed he suffered an adverse employment action in his termination.

Plaintiff's retaliation claim fails on the element of causation. As the Supreme Court observed in *University of Texas Southwest Medical Center v. Nassar*, 133 S.Ct. 2517, 2533 (2013), "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id*. In other words, a plaintiff making a Title VII retaliation claim "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Id*. at 2534.

Plaintiff provides no argument as to how his complaint to Beck was the "but-for cause" of his termination, other than stating he "was terminated approximately six weeks" after his complaint "and certainly at the first colorable opportunity." (Doc. 35 at 39). The undisputed evidence shows that after eleven

disciplinary counselings in less than four years, Plaintiff was given a final written warning in November 2014[16] notifying him dismissal would be recommended without improvement in his employment. (Hill Dep. at 116-17; Exh. K to Beck Aff.). Hill's termination was the result of the conclusion by Defendant that Hill, Jelks, and Peaden moved T.B. without permission, entered her room without a female staff member, woke her from sleep, and moved her to the safe room. While Hill may disagree with that conclusion, the undisputed facts remain. Based on these undisputed facts, Plaintiff has failed to demonstrate the requisite "but-for" causation to establish a prima facie case of retaliation.

### 2. Plaintiff has not established defendant's reason was pretextual.

Even if Plaintiff could establish a prima face case of retaliation, Plaintiff cannot establish Defendant's reason for his termination was pretext for retaliation. Plaintiff offers only conclusory allegations of pretext in his attempt to rebut Defendant's non-retaliatory reasons for his termination. In fact, Plaintiff does not offer any separate argument or evidence of retaliatory intent on the part of Defendant but instead points to his early pretext arguments. (*See* Doc. 35 at 40). For the reasons thoroughly discussed above, he has not presented evidence showing Defendant's stated reason for his termination was not the real reason for

---

[16] The record is silent as to whether this counseling occurred before or after Plaintiff's complaint to Beck. Plaintiff does not contend this counseling was an adverse employment action or that it was related to his complaints of discrimination.

his termination and that it was a pretext to hide a discriminatory or retaliatory motive.  *See* Section III.A.4. above.

## IV.    CONCLUSION

For the foregoing reasons, Defendant The University of Alabama Board of Trustees is entitled to judgment as a matter of law on all the claims asserted in Plaintiff's Second Amended Complaint.  As such, Defendant's motion for summary judgment (Doc. 25) is due to be granted.  A separate order will be entered.

**DONE** this 31st day of January, 2018.

STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE